## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **THOMAS SILLER and WALTER ZIMMER,** c/o Friedman & Gilbert 1370 Ontario Street, Suite 600, Cleveland, OH  44113 | **Case No.** |
| **Plaintiffs,** | **Judge** |
| **v.** | |
| **JOSEPH SEROWIK** 18016 E. Park Dr. Cleveland, OH  44119 | **Magistrate Judge** |
| and | |
| **THE CITY OF CLEVELAND,** 601 Lakeside Ave. Cleveland, OH  44114 | |
| **Defendants.** | **JURY TRIAL DEMANDED** |

## COMPLAINT AND JURY DEMAND

### INTRODUCTION

1.      This civil action seeks money damages for the extraordinary injuries and losses suffered by Plaintiffs Thomas Siller and Walter Zimmer, who were wrongfully convicted and each forced to spend 13 years in prison for a brutal murder—the bloody beating of an elderly woman Siller and Zimmer worked for—that they did not commit.   Forensic blood and DNA testing ultimately showed that the crime was actually committed by known felon Jason Smith, who committed perjury when he claimed that Siller and Zimmer committed the crime.  The jury

believed Smith's story because Joseph Serowik, a forensic serologist with the Cleveland Police Department, fabricated evidence that none of the victim's blood was on the front of Smith's pants.  That evidence was false—Zolkowski's blood was spattered on the front of them.  Serowik's fabrications were consistent with his fabrications and misconduct in other cases while employed with the City of Cleveland—including his notorious false scientific evidence that sent a man named Michael Green to prison for 13 years for a rape he did not commit.  DNA evidence exonerated Green, and he filed a federal lawsuit to recover for the egregious violations of his civil rights at the hands of Serowik and the City of Cleveland.  Siller and Zimmer now also bring this suit for the violations of their rights and their 13 years of wrongful imprisonment.

## JURISDICTION

2.    This action arises under the laws of the United States, and jurisdiction is conferred on this Court under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).  Supplemental jurisdiction of the Court over the claims arising under state law is invoked under 28 U.S.C. § 1367 (supplemental jurisdiction).

## VENUE

3.    Venue in the Northern District of Ohio is proper under 28 U.S.C. § 1391(b), because it is the district in which the defendants reside or resided, and because a substantial part of the events or omissions giving rise to the claims occurred within the Northern District of Ohio.

### JURY DEMAND

4.      Plaintiffs request a jury trial on the issues and claims set forth in this Complaint.

### THE PARTIES

5.      Plaintiffs **Thomas Siller** and **Walter Zimmer** are adults residing in Cuyahoga County, within the Northern District of Ohio.

6.      Defendant **Joseph Serowik** was, at times pertinent to this Complaint, a scientific examiner in the forensic laboratory of the Police Department for the City of Cleveland, which is located within the Northern District of Ohio.  Defendant Serowik is being sued in his individual capacity.

7.      Defendant **City of Cleveland** is a municipality in the state of Ohio, and is subject to governmental liability in connection with claims asserted in this Complaint and is located within the Northern District of Ohio.

### FACTS

**Siller and Zimmer work for Zolkowski and visit her often.**
**Jason Smith has no relationship with her.**

8.      In the fall of 1996, Siller and Zimmer worked as handymen for Alice Lucy Zolkowski, an elderly woman who lived in the same Cleveland neighborhood as they did.  Siller and Zimmer did various jobs at Zolkowski's home, and Zolkowski paid them for the work.  She also loaned them money on a number of occasions.  They frequently visited her, and she kept detailed tally sheets of the amounts she loaned them.

3

9.      Zolkowski's next-door neighbor stated that Siller always seemed to be helping Zolkowski and never exhibited any type of attitude toward her.  The neighbor further stated that Siller and Zimmer were among the few people Zolkowski trusted to let into her home, and they sometimes visited late at night.

10.     By June 1997, Zolkowski's tally sheets showed that Siller owed her $12,155 and Zimmer owed her $7,640.  Zimmer had also recently brought a glass block window into the home for repairs.

11.     Siller and Zimmer had no record of violent criminal history.

12.     Jason Smith was a violent felon living in Cleveland in 1997, not far from the same neighborhood where Zolkowski lived.  He had previously been convicted of aggravated assault, drug trafficking, possession of criminal tools, receiving stolen property, and motor-vehicle theft. He had no relationship with Zolkowski.

**The crime and investigation**

13.     Late on the night of June 3 or in the early morning hours of June 4, 1997, someone kicked in the back door to Zolkowski's home and broke in.  The violence she would soon be subjected to was horrific.

14.      Police, responding to a 911 call around 4 a.m., arrived at Zolkowski's home and found her unconscious, tied to a chair in her living room with bindings made of cloth cut from her nightgown.  She had been severely beaten, and a large amount of blood surrounded the chair she was tied to.  She never regained consciousness, and therefore never implicated anyone in the crime.

15.     The City of Cleveland's Scientific Investigation Unit recovered fingerprints from Zolkowski's home.  Not surprisingly, Zimmer's fingerprints were on the glass block window that he had recently handled, and Siller's fingerprints were on an ashtray on a cocktail table.  Even the prosecutor would later explain that these fingerprints were of little consequence because everyone knew that Siller and Zimmer were frequently at the home.  But Smith's fingerprints were also found inside—on a dresser drawer in the bedroom.  Because Smith had no known relationship with Zolkowski, he became the primary suspect.

16.     The day of the incident, Detective Kathleen Carlin talked to people in the neighborhood and learned that Siller and Zimmer were contractors who frequently were at Zolkowski's home.  Detective Carlin left word in the neighborhood that she wanted to speak with them.  The very next day (June 5), Siller called Detective Carlin and arranged to speak with her on June 6.

17.     Siller arrived at Detective Carlin's office and spoke with her for approximately an hour and a half.  Siller did not request a lawyer.  Detective Carlin condensed the conversation into a two-page statement that Siller signed.  Siller explained that he had worked for Zolkowski since fall of 1996.  He had last seen her on the afternoon of June 3 after he had taken her to the bank and then dropped her off at her home around 4:00 pm.  Later, in the early morning hours of June 4, he started receiving pages from Rosie Crowder, so he went to Crowder's home.  Zimmer was there and told Siller that he had discovered Zolkowski beaten up in her home.  Siller yelled at Zimmer for not calling police, but Zimmer explained that he had a warrant out for his arrest (for driving with a suspended license).  Siller took Zimmer home and then called 911 from a payphone.  In his statement to Detective Carlin, Siller also explained that Zolkowski had loaned

5

him approximately $12,000 over the course of time that they knew each other, and he had borrowed $200 from her on June 3.

18.     The same day that Siller spoke with Detective Carlin (June 6), Zimmer and Crowder also voluntarily came in to speak with her.  Neither of them requested a lawyer either.

19.     Crowder explained that Zimmer arrived at her home around 2 or 2:30 a.m. on June 4 and told her that he had just been at Zolkowski's and saw her beaten up.  Crowder paged Siller, who arrived approximately 15 minutes later.  She said Siller and Zimmer then left to call 911.  Siller then returned to Crowder's home, stayed the night, and left for work in the morning.

20.     After speaking with Crowder, Detective Carlin then spoke with Zimmer for about an hour, and he signed a two-page statement.  He explained that he was on his way to Crowder's home early on the morning of June 4 and saw Zolkowski's lights on as he walked past her home. He knocked on the door, got no answer, and went around to the back door where the screen door was open and he could see inside.  He saw cabinets open and items strewn all over the floor. When he walked in, he discovered Zolkowski in the chair, bloodied and beaten, and unconscious. He immediately went to Crowder's home to tell her what happened and to page Siller.  Zimmer stated that this occurred around 2:15 a.m. or 2:45 a.m.  Siller took Zimmer home and went to call 911.  Zimmer further stated to Detective Carlin that Zolkowski had loaned him approximately $5,000 over the last eight months.

21.     On June 13, Siller voluntarily gave another statement to Detective Carlin.  Siller stated that he had been at a bar called Chaulkie's with Zimmer on the evening of June 3, and he stated that he remembered he had borrowed $240 from Zolkowski that day, not $200.

22.     On June 14, police looked for Jason Smith to arrest him.  His girlfriend, Jenean Harper, told police that Smith was not at her home, but they found him there hiding in a closet.  Smith was arrested and charged with the attack on Zolkowski, and Harper was charged with obstruction of justice for trying to hide Smith from police.  Police also confiscated Smith's bloodstained beige pants from Harper's house the next day.

23.     On June 16, Smith gave a statement to Detective Carlin.  He denied any involvement in the crime.  He stated that he had previously seen Siller and Zimmer working on a sidewalk outside of Zolkowski's home, but Smith stated that he had never met Zolkowski.  Detective Carlin asked Smith to provide a blood sample, but he refused.  She later obtained a court order and obtained Smith's blood sample against his will.

24.     Also around June 15–16, Smith had begun talking with the other inmates in jail, including a man named Ed Farrell.  According to Farrell, Smith was boasting that he had committed the crime against Zolkowski (breaking into a home and beating up an old lady) but that he would not be convicted because he had people in Kentucky that were going to "alibi him" to show that he could not have been at the house that night.  Farrell also noted that Smith stated that he was not worried about a co-defendant "snitching" on him because nobody else was there when he committed the crime.  Farrell reached out to Detective Carlin on June 16 to inform her that Smith had confessed to the savage beating—and that Smith stated that he acted alone.

25.     Smith learned from a phone call with Harper that police had indeed recovered his clothing from her home.  He knew there was blood on his pants.  He asked to speak to Detective Carlin again.  At this point, Detective Carlin knew about Smith's confession to Farrell.

26.     On June 17, Smith spoke with Detective Carlin for the second time.  He again denied involvement in the crime and claimed as an alibi that he was in Kentucky on the night of

the crime.  Smith also added that he had been working at a restaurant and cut his right leg, which caused some blood to get onto his pants.

27.     Around this time, Smith's beige pants were submitted to the City of Cleveland's laboratory, to serologist Joseph Serowik.  Serowik's observation sheets noted not only that the pants had suspected stains inside the right knee area, but also included the following observation:

"small stains on front legs – spatter patterns"

28.     Serowik assured the prosecutor that these spatter stains were not blood.

29.     Smith maintained his innocence for months, but changed his mind once he learned that Harper had agreed to testify against him as part of her own plea agreement.   At that point, Smith entered a plea deal on March 4, 1998, and admitted he was at Zolkowski's home that night.  The Ohio court of appeals would later describe the plea deal as "breathtakingly favorable" to Smith.  All he had to do was testify that he was present at her home but that the attack on Zolkowski was actually committed by Siller and Zimmer.  In return, the State would drop the following four of the five charges against Smith for the crime: (1) attempted aggravated murder; (2) aggravated robbery; (3) kidnapping; and (4) felonious assault.  Only the fifth charge, aggravated burglary, would remain—and he would receive an agreed-to minimum sentence of just three years.  Moreover, Smith was given immunity from prosecution for aggravated murder if Zolkowski ultimately died from her injuries.  Finally, two other pending drug cases against Smith were dismissed outright.

30.     Smith gave a statement implicating Siller and Zimmer the same day that he entered his plea deal.  Because Serowik had not told the prosecutors that there was blood on the

8

front of Smith's pants, they did not know that Smith's story was a lie and that he was the one who attacked and killed Zolkowski.

31.    Smith's statement, confirmed in the prosecutor's mind by Serowik's forensic work, led to the indictment, arrest, and trial of Siller and Zimmer.

32.    Smith, now guaranteed just three years in jail with all other charges (and two other cases) dropped entirely, was now set to testify at trial that Siller and Zimmer were the ones who committed the beating.  And Serowik was set to present the results of his forensic work (including his analysis of Smith's pants), which supported Smith's story that he was not involved in the attack.

### Trial for attempted murder
#### (*Siller I*)

33.    Siller and Zimmer were tried together in 1998, and they maintained their innocence: Their defense was that they were not there, and Smith committed the crime alone, just as he confessed to Farrell.

34.    Smith claimed in his testimony that Siller and Zimmer went with him to Zolkowski's home that night.  Smith said he waited in a car while Siller and Zimmer went to the back door.  (Smith claimed this to be true even though Siller and Zimmer knew Zolkowski well, frequently visited her, and used the front door.)  Smith said he later came inside and saw Zimmer standing over Zolkowski yelling, but Smith said he never actually saw Zimmer strike her; Smith further claimed that he never even entered the room where Zolkowski was beaten.  Smith made sure to add testimony that, on the way out, he "noticed that the wood on the door was messed up and broken."  (Trial I at 351.)

35.     The prosecutor had conceded in his opening that Smith was "incredible," but suggested that in light of other facts and circumstances, "all of a sudden, [he does] become believable." (*Id.* at 27–28.) The prosecutor emphasized that the scientific evidence regarding Smith's pants would show that to be the case.

36.     Serowik testified on behalf of the prosecution that he examined and tested Smith's pants for blood.  Serowik explained his conclusions that Smith's pants indicated that they had no blood spots or spatters matching Zolkowski's blood.  There were a number of darker stains on the pants, but Serowik reported that they were of "questionable color" to be considered blood and that he may not have tested those at all.  (*Id.* at 459.)  Serowik also confirmed that if he were provided a piece of clothing that had many stains that he suspected may be blood, say even 30 or 40 stains, he would test them all.  (*Id.* at 460.)  In sum, Serowik explained that he had tested the pants for any suspected blood, and there were no matches to Zolkwoski's blood on Smith's pants.  This perfectly supported Smith's story that he was never even close to the bloody beating.

37.     The prosecutor remarked at trial that, though Smith's fingerprints were found on a bedroom dresser, "the lack of blood on his clothing" showed that he "wasn't the one who beat this woman." (*Id.* at 28.)  In closing, the prosecutor emphasized to the jury that "[w]hoever did this vicious beating probably got some blood spattered on the clothes," and that Zolkowski's blood was "not found on any clothing" belonging to Smith.  (*Id.* at 728–29.)  Finally, the prosecutor reminded the jury that Serowik is a forensic examiner who did "the official testing of the blood" in this case, and "there is no blood spatter on any of [Smith's] clothing." (*Id.* at 736–37.)

38.     In light of Serowik's scientific evidence, both Siller and Zimmer were convicted. Siller was sentenced to 20 years in prison.  Zimmer was sentenced to 40 years.

**Trial for murder (after Zolkowski's death) (*Siller II*)**

39.     Zolkowski ultimately died from her injuries on April 26, 1999.  Siller and Zimmer were then indicted for murder.  This time, they were scheduled to be tried separately, with Siller scheduled first.  Jason Smith was immune from any prosecution because of his plea deal, and he again would be the prosecution's star "eyewitness."

40.     This trial was similar to the first, but some other "jailhouse witnesses" were added to the mix for both sides.  For example, one jailhouse witness testified that he overheard Siller deny any involvement in the crime when talking with another inmate, yet that inmate testified (presumably to benefit himself) that Siller confessed to him.  That inmate's testimony also did not fit the physical evidence or even Smith's version of the events.

41.     Smith, of course, stuck to his story about being far away while the attack on Zolkowski occurred.  But his testimony also contradicted his previous testimony on critical facts.  For example, in this trial he stated that he actually saw Zimmer strike Zolkowski in the face.  In the first trial, Smith stated he did not see Zimmer strike her.

42.     This trial also revealed that Smith was something of a professional when it came to cutting deals for himself in exchange for testimony against others.  Siller and Zimmer learned that he had done the same thing in three other cases where he was charged with criminal conduct.  Two inmates also testified that Smith had boasted to them that he had previously beat a murder charge by falsely implicating others.

43.     Serowik again explained that his analyses supported Smith's story, describing to the jury that Serowik had "look[ed] for the presence of blood" on Smith's clothing, done testing, and none of Zolkowski's blood was found.  (Trial II at 2081.)  This would have been exactly what Serowik told the prosecutor before any indictment or trial.  Siller's counsel questioned

Serowik about the lack of reported results regarding the left pant leg, and Serowik explained that "the tests were negative and we did not report them." (*Id.* at 2098.)  Serowik emphasized that the stains did not go untested, because "every stain" that appears to be blood is tested. (*Id.* at 2103.)  Counsel again asked about a particular stain on the back of the left pant leg that was not reported.  Serowik responded: "Sir, again, it was negative for blood." (*Id.* at 2104.)  Serowik further emphasized that his team would test "any stain that even remotely looks like it could have a bodily fluid . . . ." (*Id.* at 2018.)  Siller's counsel then confronted Serowik with his previous testimony where he had stated that he may not have tested all the stains.

44.     The judge stopped the trial, and Smith's pants were resubmitted for further testing.

45.     Six days later, Serowik returned to the stand.  He explained that he re-tested the stain on the back of the left leg—it matched the blood of Zolkowski.  On cross, Serowik further stated that the stain had actually tested positive for blood when it was originally examined.  He also admitted that there was no paperwork documenting that conclusion.  He claimed it was an "oversight."

46.     In light of the revelation that the single stain on the back of Smith's pant leg was indeed Zolkowski's blood, the State considered dismissing the case against Siller and vacating Smith's immunity agreement so that the State could instead prosecute Smith for the murder.

47.     But Serowik had also explained to the prosecutor that there were no other stains on Smith's pants that appeared to be blood and that he had tested further to confirm that.  Serowik had told the prosecutor that there were no other bloodstains on Smith's pants, and the prosecutor had him relay this point in his testimony to the jury:

12

Q.      Did you find any other stain on those pants that was blood?

A.      No, we did not.  (Trial II at 2715).

48.      Thus, the State ultimately decided to characterize this blood-evidence issue as a simple error and to proceed against Siller instead of Smith.  The State's strategy was to argue that there was only this single spot of Zolkowski's blood on Smith's pants, and it was on the back of the pants.  Smith suggested in his testimony that it could have gotten there by brushing against Siller.  And, more fundamentally, the prosecutor knew that if Smith had beaten her, there would almost surely be blood on the front of his pants—and Serowik had already assured him that there were no other bloodstains.  The prosecutor made this precise point to the jury, in reliance on Serowik and the City of Cleveland's scientific laboratory: "If [Smith] had been the one to beat Lucy Zolkowski, I would submit to you that there would be more blood and it would be on the front of his pants."  (*Id.* at 3535.)

49.      The jury apparently agreed, and Siller was convicted of aggravated murder with felony-murder specifications.  He was sentenced to 30 years to life in prison on July 30, 2001, concurrent to his conviction from the first trial.

50.      Because the evidence against Siller (such as Serowik's results that there was no blood on the front of Smith's pants) would be used against Zimmer at his trial, Zimmer decided to plead guilty (to involuntary manslaughter during an aggravated burglary).  He was sentenced to 10 years in prison, consecutive to his previous 40-year sentence.

### Serowik fabricates scientific evidence against Michael Green for rape

51.      A few months after Siller's conviction, a man name Michael Green was exonerated after Serowik's forensic work linking him to a rape was discovered to be fabricated.

13

The rapist in Green's case had wiped his penis with a washcloth, and Serowik reported that fluid on the washcloth was a type "B" that matched 16% of the population, including Green.  Serowik further reported that a hair on the washcloth matched Green's hair, and that the possibility of two people having such a match was about one in 40,000.  Serowik gave this information to the prosecutor,  and Green was convicted.  After Green had spent 13 years in prison, a DNA test definitively excluded Green, proving he was not the rapist.  Green was officially exonerated and released within days.  The DNA matched another man, the actual rapist, who has since confessed and been convicted.

52.    Green filed a federal lawsuit in which it was revealed that Serowik's work and conclusions were fabricated—Serowik had actually *excluded* Green as the rapist.  That exclusion was based on a proper pubic-hair comparison, but Serowik then claimed that Green's head hair matched the pubic hair on the washcloth.  Comparing different hairs in this way violates the most-elementary tenets of hair analysis, and Serowik knew that.  Further, Serowik knew that the victim was also a type "B" secretor and that therefore there was no conclusion to be drawn about the rapist's blood type.  The evidence Serowik created against Green was entirely fabricated.

53.    Expert forensic witnesses in the *Green* case concluded that Serowik's misconduct was not isolated to that case; rather, it was a systematic pattern in many cases.  Max Houck, a former hair examiner for the FBI and one of the foremost hair experts in the country, reviewed a number of cases involving Serowik's work.  Houck concluded as follows:

> Serowik acted contrary to his admitted understanding of
> established and accepted tenets in the science of forensic hair
> comparisons without adequate explanation or extenuating
> circumstances, thereby suggesting professional misconduct.
> This is true not only the case at hand but *in all the cases I have
> reviewed of Serowik's*.  These indicate a *systematic problem*
> with his forensic hair casework as he knowingly went beyond

14

the bounds of generally accepted science of hair examination as
was practiced in 1987 and today [2004].

*See* Brief in Opposition to Motion for Summary Judgment filed by Michael Green at 15 (April

12, 2004), *Green v. City of Cleveland*, No. 03-0906 (N.D. Ohio) (citing Houck expert

conclusions and Serowik's deposition) (emphasis added).

54.     Houck further concluded that this misconduct revealed failures by Serowik's

supervisor as well: "That his reports are not supported by his notes (which are inadequate to

being with) suggests an egregious error on his and his supervisor's part (failing both a technical

and administrative review), a knowing and deliberate falsification of his report, or pressure from

some other source to do so."  *Id.*

55.     Another expert, Dr. Edward T. Blake, reviewed Serowik's analysis of the blood-

type evidence in the *Green* case.  Dr. Blake concluded that Serowik "*intentionally fabricated*

*false evidence* against Green, testified at Mr. Green's trial with reckless disregard for the truth,

and *committed scientific fraud . . . .*"  *Id.* at 23 (citing Dr. Blake expert report) (emphasis added).

56.     Dr. Blake also reviewed various reports from Serowik's other cases, and Dr.

Blake concluded that Serowik's misconduct was not isolated:

> Based on these reports and Mr. Serowik's testimony, it is clear
> that Mr. Serowik's misconduct in the Green case was not
> isolated.  *As a matter of practice, Mr. Serowik committed*
> *scientific fraud* by reporting that he was able to isolate the
> genetic marker traits in semen when he knew these traits might
> all have been attributable to the victim.

*Id.* at 24.

57.     Discovery in the *Green* case further revealed systemic problems in the City of

Cleveland's crime lab.  At the time of Serowik's work in these cases (and in Siller's and

15

Zimmer's cases), Victor Kovacic was the superintendent of the crime lab.  He had complete discretion over the day-to-day work of the forensic examiners and the protocols of the lab.  There was no other person or agency providing any substantive oversight to Kovacic concerning the operation of the lab.  *See generally, id.* at 25 (citing Kovacic deposition).

58.     Kovacic was the only person with any formal supervisory responsibility over Serowik.  But Kovacic had absolutely no training or experience in serology or microscopic hair-comparison analysis.  Thus, by his own admission, he was utterly incapable of providing any substantive oversight concerning serology or hair analysis.  And when Serowik was hired fresh out of school, he had no prior work experience in serology or hair comparison.

59.     The City of Cleveland knew or should have known that Serowik had extremely limited expertise, yet he received no meaningful training or supervision.

60.     The only semblance of supervision in the lab was an informal, unsupervised peer-review process conducted by those with no prior serology experience.  When the City of Cleveland hired Serowik, his peer reviewer was Rynette Reed.  Reed had just arrived at the lab the year before, apparently with no prior serology experience.  She was also hired at a time when no other serologists were working in the lab, so she had never had a peer review herself.  Serowik even stated that he likely shared with Reed his faulty assumption in the *Green* case that he was testing a neat stain of the rapist's fluids (not one mixed with the victim's), and she still signed off on his report—contrary to any acceptable scientific practices.

61.     Dr. Blake explained that the City of Cleveland's supervision structure was grossly deficient:

> In 1988 as today, it was a gross deviation from accepted
> practice in the scientific community to have an inexperienced

16

> serologist supervised by a police administrator with <u>no</u> experience, training, or education in serology or any other science.

*Id.* at 27.

62.     Dr. Blake further stated that "had a qualified supervisor reviewed any of Mr. Serowik's serology work including his testimony, his misconduct would have been readily apparent." *Id.*

63.     And even though Kovacic admitted that he was completely unqualified to conduct or supervise microscopic hair comparison, Kovacic signed off on the hair reports in the *Green* case.  In this way, expert Houck explained, "the City of Cleveland went beyond the boundaries of forensic science as it was practiced in 1987." *Id.* at 28.  "Additionally," Houck stated, "Serowik's case notes, reports, and testimony reflect a laxity in the protocols, methods, documentation, training, and general supervision of hair casework in the laboratory." *Id.*

64.     Despite the overwhelming blatant evidence of forensic misconduct in the *Green* case and in other cases up to that point in time, there had been no internal investigation of the laboratory or of Serowik.  Expert Houck explained that this "runs counter to every known published guideline or protocol of forensic laboratory operation that I am aware of . . . ." *Id.*

### The independent audit of Serowik's cases (including Siller's and Zimmer's) reveals further systematic misconduct.

65.     In June 2004, as part of a civil settlement with Green, the City of Cleveland agreed to pay Green $1.3 million and to audit the police department's laboratory files for any similar problems during the time Serowik was employed.  He had finally been fired in light of the revelations in the *Green* case.  The audit was conducted by forensic expert Robert P. Spaulding in 2005, who submitted his analyses to Special Master James R. Wooley.

17

66.     This independent audit uncovered deficient documentation of the laboratory results in Siller's and Zimmer's case.  Among numerous problems with Serowik's documentation, Spaulding stated that Serowik's original observation sheet noted possible blood spatter on the *front* of Smith's pants.  Spaulding noted that this (obviously) could relate to Jason Smith's role in the crime.  Spaulding also noted that Serowik's shoddy and contradictory records could mean that the tests he testified that he performed were never done, meaning that Serowik had lied about them.

### The Innocence Project arranges for testing of Smith's pants.

67.     In October 2004, Siller made a pro se request to the trial court for DNA testing in his case.  The State opposed the request, and the court denied the request without an opinion.

68.     Counsel, including the Innocence Project, later renewed the request for DNA testing.  This time, the court granted the request, and the Innocence Project arranged for testing of Smith's pants.

69.     On December 26, 2006, the test results came back: There were 20 blood spatters on the *front* of Smith's pants, exactly as Serowik's initial observation notes had suggested.  Because of financial constraints, nine of these spatters were tested for DNA—two were Smith's own blood, and seven matched the blood of the victim: Alice Zolkowski.

70.     The blue dot in the image below shows the location of the single spot of Zolkowski's blood that Serowik stated was on the back of Smith's pants.  The red dots show the actual locations of her blood that was determined to be on the front and back of his pants:

18



**Blood Spatter from Victim on Jason Smith's Pants: New Evidence**

Image created by the Innocence Project from FSA photographs and reports for illustrative purposes

Red dots represent locations of blood spatter matched to victim in postconviction testing by FSA - not actual size or shape
Blue dot represents location of blood spatter matched to victim at Trial 2 - not actual size or shape.

### Siller's convictions are overturned

71.     With this evidence, Siller then moved for a new trial in both of his cases (referred to *Siller I* (attempted murder, before Zolkowski's death) and *Siller II* (murder, after her death)). The new-trial motion in *Siller II* went to a successor judge who had not handled the trials.  That judge denied the motion, noting that this DNA evidence was "merely cumulative" and was not likely to alter the outcome.  The new-trial motion in *Siller I* remained pending when an appeal was filed in *Siller II*.

72.     The Ohio Court of Appeals for the Eighth District reversed, overturning Siller's convictions in *Siller II* (the court also noted that the new-trial motion in *Siller I* remained pending).  *State v. Siller*, No. 90865, (Ohio Ct. App. June 18, 2009).  The court concluded that there is a strong possibility that if this DNA evidence were presented to a jury, "there would be a different result."  *Id.* at 19.  The court noted that "there is no independent evidence whatsoever

19

(except, again, the testimony of Smith), that the three [Siller, Zimmer, and Smith], were ever in each other's company at any time, let alone the night in question." *Id.* at 23.

73.     The court emphasized that the new evidence included "a pattern of misfeasance, malfeasance, and false testimony by Serowik in the *Green* case . . . ." *Id.* at 15.

74.     The court further stated that Serowik's failures amounted to a violation of the Due Process Clause of the Fourteenth Amendment as explained by the Supreme Court of the United States in *California v. Trombetta*, 467 U.S. 479 (1984), and *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (referring to "constitutionally guaranteed access to evidence").  The court ordered that Siller was entitled to be retried.

### Further DNA testing of Zolkowski's ripped nightgown excludes Siller and Zimmer.

75.     In 2011, the pieces of Zolkowski's nightgown that had been used to tie her to the chair were also examined for DNA evidence, and male DNA was found.  The examination excluded Siller and Zimmer as the source of that DNA.  The report stated that Jason Smith could not be excluded.

### Based on a stipulation entered into with the State, Siller and Zimmer are released.

76.     While waiting for their new trial, Siller and Zimmer remained incarcerated in county jail with a $250,000 bond neither could satisfy.  It had been 13 years for each of them since they had been free.  The State offered to dismiss all of the original charges against them (from both *Siller I* and *Siller II*) and let them be immediately released if they would plead guilty to an offense that they were never charged with in either trial: aggravated theft of $300,000 or more, under Ohio Rev. Code § 2913.02.  The State stipulated that they were never charged with this crime at the first two trials, and the State further stipulated that there was no evidence that

any cash or anything of value was taken from Zolkowski on the night she was beaten.  The aggravated-theft amount ($300,000) also had no correlation to any amounts she had loaned Siller and Zimmer over time (approximately $12,000 to Siller and $7,000 to Zimmer).

77.     With the understanding that this whole ordeal could be resolved by pleading to a charge having no correlation to the actual crimes against Zolkowski, both Siller and Zimmer pled guilty to the aggravated theft, and each was sentenced to 12 years in prison—one year less than they each had already served.  Siller entered his plea on March 24, 2011.  Zimmer entered his plea on April 1, 2011.  Credited with time served, they were finally free after 13 years.

78.     Jason Smith—whose testimony became believable because of Serowik's forensic reports—pleaded guilty to perjury for lying under oath about what really happened to Zolkowski.

### The Spaulding audit showed systematic misconduct by both Serowik and the City of Cleveland

79.     Spaulding's audit revealed widespread misconduct on both the part of Serowik and the City of Cleveland Police Department.  The audit of each case reviewed typically involved a 5–8 page report by Spaulding.  What follows is a sample of the cases Spaulding reviewed, along with brief excerpts of Spaulding's conclusion for each.  This shows that Serowik's misconduct in Green's case and in the present case was not isolated—it was a systemic pattern.  This further shows that the City of Cleveland itself has responsibility for the egregious misconduct.  Emphases have been added (in italics) to indicate particularly egregious deficiencies and to indicate where Spaulding noted that the police department itself (i.e., the City of Cleveland) shared blame.

80.     *State of Ohio v. Douglas Smith*

21

"Errors in testimony due either to a lack of knowledge/understanding or *in the opposite extreme, intentional misrepresentations* are discussed above[.]"

"While the training records of Mr. Serowik have not been part of this audit, the material reviewed, particularly in this case, *raises the question of his extent of training* and understanding regarding the subjects with which he was dealing. There is also a *question as to the amount and nature of training required by the Police Department (if required)* and on what basis (annual, biannual, etc.) this training was to be taken."

81.     *State of Ohio v. Andrew Ferguson*

"*The practice of incomplete documentation does not follow proper scientific procedure and is one the responsibility for which falls on both the Department and the individual.*"

"[T]he absence of original data to support these analyses" such as those regarding blood and saliva samples raises the *possibility of the analyses "having been fabricated."*

82.     *State of Ohio v. James Berry*

"The methods and requirements for recording analytical data and results were inadequate, both administratively and scientifically. The complete lack of original data on the lab cards or in the examination notes regarding the species origin assay of blood, the absorption inhibition assay of the condoms or the typing of the known blood sample for Berry is a *poor practice in documenting forensic work with criminal evidence.* The apparent missing vaginal slide seems to amount to loss of *or ignoring evidence.*"

"While the individual scientist is responsible for documenting work done, *the role of the Department cannot be ignored.* The oversight and supervisory role was clearly not exercised in this matter."

"Mr. Serowik's testimony regarding the inability of forensic serology to perform any further analysis on the vaginal smear slide(s) is not correct in my view and *may be due to lack of knowledge/experience or a failure to see that the analysis was carried out.* I am inclined to think the former."

83.     *State of Ohio v. Ronnie Shelton*

"It is clear that a lack of documentation of analytical observations and results of analysis *was a practice in the*

22

*Laboratory for a significant period of time* both before and after Mr. Serowik became employed."

"Adequate training of forensic serologists in this area is (was, prior to DNA analysis) critical to the proper analysis and interpretation of results obtained.  It appears Mr. *Serowik did not receive the training he should have* in this area."

84.   *State of Ohio v. Johnny Lee Knight*

"In this case, the available records exhibit a considerable lack of original data to support the reported results and testimony.  *The extent of this absence of data and recorded information is considerable, unscientific and unprofessional.*  Not being able to state what was done, when it was done, what the specific results were and recount the specific results (originally observed data) of an analysis suggests *there was little policy to guide the examiner or little concern on the part of the examiner to follow any such guidelines*."

"There is appears to be a *gap in understanding* regarding the significance of certain analytical results (a negative acid phosphatase result, 'no antigens' vs an 'inconclusive result' in a stain containing semen, etc.) in Mr. Serowik's work."

85.   *State of Ohio v. Brian Lewis*

"The imperative need for thorough documentation of both the administrative processes and observations made during the analysis of evidence is illustrated in this case."

"*At one point, it is admitted that an assumption was made with respect to the source of a questioned blood stain.  This is not acceptable, at least, not without explanation of the basis of the assumption*."

"Based on the available information, *Mr. Serowik is not qualified to offer testimony on forensic hair examinations* and the hair examination testimony should not have been presented."

"With regard to the basics of record keeping and data retention, the lack of such information in the case file is *not an acceptable scientific practice*."

86.   *State of Ohio v. Wayne Bogan*

"The practice of incomplete case examination documentation is one the responsibility for which falls on *both the Department* and the individual."

While it does not appear that Serowik falsely presented results, "Without a complete review of the case documentation to include the actual raw data (which is not available), however, this cannot be stated with absolute certainty."

87.   *State of Ohio v. Rocco Ortiz*

"The apparent lack of supporting documentation for the off-site chair examination and the testimonial discussion of testing conducted on the chair was *not acceptable scientific practice* at that time or currently."

88.   *State of Ohio v. Eric L. Anton*

"The lack of original data and information regarding observations, results, and the conduct of testing procedures is *not in keeping with correct forensic practice*.  In the writer's opinion, responsibility for this deficiency lies with both the analyst *and the Department*."

89.   *State of Ohio v. Daryl Thornton*

"Laboratory documentation in this matter was essentially non-existent, eliminating the possibility of any verification of analytical observations and conclusions.  The notation indicating that 'sample taken for standard, no notes created' from the provided information and regarding the liquid blood sample of the victim in the case is *not an acceptable standard method of operation in a forensic laboratory*."

"While this case serologically is relatively uncomplicated, Mr. Serowik demonstrated a lack of understanding in the interpretative aspects of the case and consequently was *not capable of accurately presenting the implications of his analytical conclusions to the court*."

90.   *State of Ohio v. Stanley M. Arrowood*

"Highlighted in this case is the *lack of recorded data* to support the results of examinations and analyses set forth on the front of the Lab Cards."

91.   *State of Ohio v. Walter Broom*

"The most significant deficiency in the case documentation is the *lack [of] original raw data* regarding controls and the

observed information with respect to the species origin and P30 assays."

92.    *State of Ohio v. Eugene D. Canady*

"The absence of species origin and absorption elution original data in the examination notes is *not consistent with normal practice* in most laboratories at the time."

93.    *State of Ohio v. Moses Clark, Jr.*

"As with other cases examined in the late 1980's, the recording of data and details regarding the evidence was extremely limited in the Department's Serology Section.  While this responsibility weighs to some extent on the laboratory examiner, *it is also the Department that sets policy (or perhaps should)* and determines the manner and content of the record keeping with regard to casework."

94.    *State of Ohio v. Michael O. Fuller*

"The absence of original data to support the results of analysis reported with regard to the acid phosphatase, species origin and P30 assays *does not conform to proper scientific documentation of forensic casework*."

95.    *State of Ohio v. Jerry Gillespie*

"The most obvious point in this case is the *lack of notes, original data and observations regarding the evidence and the testing of it*.  A key aspect of the scientific analysis of any material is the recording of data and observations so that an analysis may be repeated and verified as might be required."

96.    *State of Ohio v. Leroy Glass*

"The lack of notes, data, observations and analytical information regarding the evidence examined *is and was inconsistent with proper scientific practice*.  Responsibility for this *rests on both the Department and the individual*.  Mr. Serowik's incomplete preparation for testimony likewise was not consistent with the presentation of forensic testimony then nor is it now."

97.    *State of Ohio v. Dwayne Harris*

"The absence of laboratory data reflecting the actual results of analyses is *not consistent with proper scientific practice in forensics* at the time the analyses were conducted."

98.    *State of Ohio v. Ronald Hickman*

"While there is significant recording of data and observations for the evidentiary examinations, there is *no record of the actual original data observed* when the final results of the testing protocols were observed."

99.     *State of Ohio v. Thomas M. Keenan*

"*Record keeping practices both administratively and scientifically were lacking* at the time this case was examined in the laboratory.  The responsibility for this cannot be entirely assigned to an individual since *the Department is ultimately responsible for the day to day operation for the units, sections, etc. within it.*  From a scientific perspective, however, individual recording of data and results were incomplete."

100.     *State of Ohio v. Billy Slagle*

"The available laboratory records of analysis (lab cards, examination notes) do not include raw data or results of testing controls conducted contemporaneously with the evidentiary samples.  Rather, conclusions are recorded without data showing the actual results and the manner in which the tests were performing.  This is *not proper scientific documentation of an analysis.*"

101.     *State of Ohio v. John McKinney*

"*The absence of data as discussed above is not acceptable scientific procedure.*"

102.     *State of Ohio v. Reginald Pearson*

"*The lack of recorded data, observations and notes regarding the examination of evidence in this matter is not in keeping with standard scientific practice.*"

103.     *State of Ohio v. Edward H. Pearl*

"The lack of data and documentation to support the results presented may be a result of *failure to locate the information or a complete absence of documentation.*  Based on the available information it appears it may be both."

104.     *State of Ohio v. Paul Primerano*

"[T]he absence of recorded data of any original nature is *not proper scientific procedure* and should not have taken place. As has been observed in previous cases during this audit, adequate documentation of the analysis of evidence lies with *both the individual and the Department.*"

26

105.  *State of Ohio v. William Reynolds*

"*Record keeping was apparently nearly non-existent* with respect to the testing procedures used and the data observed at the time this case was analyzed.  *This lack of information extended to a time before Mr. Serowik was employed.*  In any scientific effort, documentation of the procedures, observations, results, and any factors which may be of importance during a later consideration of the work (such as presentation of testimony) is imperative."

106.  *State of Ohio v. Daries Y. Sherrills*

"As in other cases reviewed during this audit, the preservation of original data and details of the analytical process of examining evidence were not . . . adequately/properly documented.  This is a responsibility of both the forensic scientist *and the agency* maintaining a forensic laboratory within [its] organization."

107.  *State of Ohio v. Lee Walker*

"*Documentation of analytical data and observations was not available* for review in this matter.  If any documentation was prepared it should have been preserved."


## COUNT ONE

**42 U.S.C. § 1983 claim against Serowik for submitting false and fabricated evidence in violation of the Due Process Clause and precedent such as *California v. Trombetta*.**

108.  All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth here.

109.  Serowik knowingly and in bad faith submitted false and fabricated evidence that implicated Siller and Zimmer in Zokowlski's beating.  Alternatively, Serowik submitted such evidence with reckless disregard for the truth.  Serowik submitted false and fabricated evidence to the prosecutor, including the false representation that front of Smith's pants had no

bloodstains.  That evidence supported Jason Smith's false testimony that he was not directly involved in Zolkowski's beating.

110.    Serowik's actions reflect a pattern of fabricating evidence that has been shown in other cases, as noted above.

111.    Serowik's actions caused Siller and Zimmer to be wrongfully convicted and imprisoned.  This caused extraordinary damages for Siller and Zimmer.  If Serowik had not falsified and fabricated evidence, Siller and Zimmer would never have been convicted for crimes related to the attack on Zolkowski, they never would have been imprisoned for such crimes, and they would not have needed to enter any sort of plea agreement to have their freedom.

112.    Serowik's actions violated Siller's and Zimmer's rights under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT TWO

### 42 U.S.C. § 1983 claim against Serowik for withholding exculpatory evidence in violation of the Due Process Clause and precedent such as *Brady v. Maryland*.

113.    All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth here.

114.    Serowik had material exculpatory evidence that was favorable to Siller and Zimmer, but he withheld it from the prosecutor (and, in turn, it was withheld from Siller and Zimmer).  This evidence is discussed in detail above, and it includes, for example, Serowik's own observations that there was possible blood spatter on the front of Smith's pants—blood that belonged to Zolkowski.

28

115.    Had this evidence been disclosed to the prosecutor, Siller and Zimmer would not have been convicted for the attack on Zolkowski.

116.    As an employee of the City of Cleveland's police department, Serowik had a duty under *Brady v. Maryland* and the Fourteenth Amendment of the U.S. Constitution to turn over exculpatory evidence to the prosecutor.  *See generally Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2010) (discussing *Brady*-derivative claims).

## COUNT THREE

### 42 U.S.C. § 1983 *Monell* claim against the City of Cleveland for failing to train and supervise Serowik.

117.    All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth here.

118.    As a matter of policy, the City of Cleveland systematically failed to supervise and train the scientific examiners working in the lab, and this inadequate supervision and training amounted to deliberate indifference.  The deliberate indifference is evident because the need for training and supervision in the basic duties of a forensic scientist are so obvious, and deficient forensic work is so likely to result in the violation of constitutional rights.  This lack of training and supervision caused Serowik to fabricate evidence and to withhold exculpatory evidence. This failure was also the moving force behind the violations of Siller's and Zimmer's constitutional rights.

119.    Serowik's misconduct was repeated, blatant, and easily discoverable if there had been adequate supervision.

120.    The City of Cleveland failed to ensure any meaningful training or supervision to Serowik despite knowing that he lacked expertise and proficiency.

121.    Serowik knew that nobody was reviewing the substance of his work and that his supervisor did not have sufficient expertise in serology or hair analysis to even recognize his knowing fabrications.

122.    The City of Cleveland knew since at least 2001, when Dr. Blake first wrote of Serowik's egregious misconduct in the *Green* case, that Serowik was fabricating evidence.  Yet the City took no action to further investigate or discipline him until it agreed as part of its settlement in that case in 2004 to conduct a full audit of Serowik's past work.  This failure to act for so long amounts to ratification of Serowik's misconduct.

123.    The City of Cleveland's actions caused violations of Siller's and Zimmer's rights under the Due Process Clause, and similarly caused them extraordinary damages detailed in this Complaint.

## COUNT FOUR

**42 U.S.C. § 1983 *Monell* claim against the City of Cleveland for
a pattern, practice, or custom of fabricating inculpatory
forensic evidence and withholding exculpatory evidence.**

124.    All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth here.

125.    In all of the cases in which Serowik committed misconduct, the City of Cleveland signed off on his reports.  His misconduct was widespread and systematic.

126.     The City of Cleveland's failure to keep original records of forensic data in a litany of cases fell below minimally acceptable standards and amounted to deliberate indifference to the constitutional rights of those purportedly implicated by the forensic analyses.

127.     The City of Cleveland had a policy, pattern, or custom of fabricating inculpatory evidence and/or withholding exculpatory evidence, and this was a moving force behind the constitutional violations suffered by Siller and Zimmer.

### COUNT FIVE

### Malicious prosecution under federal law against both Defendants

128.     All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth here.

129.     A criminal proceeding was initiated against Siller and Zimmer, and Defendants influenced or participated in the decision to prosecute.   For example, Defendants knew that Smith's pants had spatter stains on the front of them, well before Siller and Zimmer were indicted—yet this was withheld from the prosecutor.  Defendants initiated and/or continued a prosecution against Siller and Zimmer, with malice, and without any probable cause to believe Siller or Zimmer committed any crime against Zolkowski, causing their wrongful convictions. As a consequence of the proceedings, Siller and Zimmer suffered a deprivation of liberty.  The criminal charges underlying those wrongful convictions have since been terminated in Siller and Zimmer's favor.

## COUNT SIX

### Malicious prosecution under state law against both Defendants

130.    All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth here—most relevant are the paragraphs under Count Five.

## COUNT SEVEN

### Intentional infliction of emotional distress against both Defendants

131.    All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth here.

132.    Defendants intended to cause emotional distress or knew or should have known that their actions (as noted above) would result in serious emotional distress to Siller and Zimmer.

133.    Defendants' conduct was so outrageous in character and extreme in degree as to go beyond all bounds of decency.

134.    Defendants' conduct proximately caused injuries to Siller and Zimmer.

135.    The mental anguish suffered by Siller and Zimmer as a result of Defendants' conduct is of a nature that no reasonable person could be expected to endure it.

## DAMAGES

136.    The actions of Defendants, jointly and severally, deprived Plaintiffs of their constitutional and civil rights guaranteed under the U.S. Constitution.

137.    As a direct and proximate cause of Defendants' acts, Plaintiffs each wrongfully served approximately 13 years in prison.

138.    Plaintiffs suffered loss of job training, employment, and wages during their incarceration.

139.    Plaintiffs lost the friendship and companionship of others, including their family.

140.    Plaintiffs have suffered mental and psychological stress as a result of being publicly and falsely prosecuted for murder, and as a result of a reasonable fear that they would spend the remainder of their lives in prison for a murder they did not commit.

141.    As a direct and proximate result of Defendants' acts, Plaintiffs suffered damages and injuries for which they are entitled to compensatory damages in an amount to be determined at trial.

142.    Defendants' acts were intentional, malicious, deliberate, reckless, wanton, and/or cruel, such as to justify and award of punitive damages to Plaintiffs.

143.    Plaintiffs furthermore suffered other injuries set forth in the other paragraphs of this Complaint.

### PRAYER FOR RELIEF

Accordingly, Plaintiffs request as follows:

A.    That the Court award compensatory damages to them and against the defendants, jointly and severally, in an amount greater than $1 million, to be determined at trial;

33

B.      That the Court award punitive damages to Plaintiffs against Serowik, in an

        amount to be determined at trial that will deter such conduct by Serowik and

        others in the future;

C.      For a trial by jury;

D.      For pre-judgment and post-judgment interest and recovery of Plaintiffs' costs,

        including reasonable attorneys' fees under 42 U.S.C. § 1988 for all 42 U.S.C.

        § 1983 claims and costs under 42 U.S.C. § 1920; and

E.      For any and all other relief to which they may be entitled.


Dated:  March 19, 2013                    Respectfully submitted,


                                          /s/ Terry H. Gilbert_____


                                          Terry H. Gilbert (OH 0021948)
                                          FRIEDMAN & GILBERT
                                          1370 Ontario Street, Suite 600
                                          Cleveland, OH  44113
                                          Phone:   (216) 241-1430
                                          Fax:     (216) 621-0427
                                          E-mail:  tgilbert@f-glaw.com


                                          David E. Mills (OH 0075400)
                                          THE MILLS LAW OFFICE LLC
                                          1300 West Ninth Street, Suite 636
                                          Cleveland, OH  44113
                                          Phone:   (216) 929-4747
                                          Fax:     (202) 379-1767
                                          E-mail:  dm@MillsFederalAppeals.com

                                          *Counsel for Plaintiffs*